# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 11, 2025 Session

## STATE OF TENNESSEE v. JOHNATHAN V. DUNCAN

**Appeal from the Criminal Court for Wilson County**
No. 21-CR-800    Michael Wayne Collins, Judge
_____

### No. M2023-01159-CCA-R3-CD

_____

Jonathan Duncan, Defendant, was indicted for first degree murder, felony murder, and aggravated robbery by the Wilson County Grand Jury for his involvement in the death of Ellis Sanders, the victim. After a jury trial, he was found guilty on all counts and sentenced to an effective sentence of life imprisonment. After the denial of a motion for new trial, Defendant appeals, arguing: 1) the evidence was insufficient to support the convictions; 2) Defendant's right to a fair and impartial jury was violated because jurors slept during trial, the trial court required the jury to work "extensive and unreasonable hours," and the trial court interfered with the jury by holding ex parte meetings; and 3) the trial court erred in allowing the State to present evidence of uncharged bad acts in violation of Tennessee Rule of Evidence 404(b). After a thorough review, we affirm the judgments of the trial court but remand the matter to the trial court for entry of corrected judgment forms to reflect merger of the first degree murder and felony murder convictions.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JEFFREY USMAN, Sp. J., joined.

Mitchell A. Raines, Assistant Public Defender – Appellate Division, Franklin, Tennessee (on appeal), and Thomas A. Maynard, Taylor Michael Durrett, and Christopher Henry Reynolds, Lebanon, Tennessee (at trial), for the appellant, Johnathan V. Duncan.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Jason L. Lawson, District Attorney General; and Justin Harris and Thomas Harwell Swink, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The victim was shot and killed while sitting in a black truck parked in a parking lot at Rollingwood Apartments on May 20, 2021. During the investigation, Defendant was developed as a suspect. He was ultimately indicted by the Wilson County Grand Jury in July of 2021 for felony murder, first degree premeditated murder, and aggravated robbery.

Prior to trial, Defendant sought to exclude evidence of prior bad acts pursuant to Tennessee Rule of Evidence 404(b), specifically video and testimonial evidence that he was engaged in an alleged drug deal, gunfire, a car chase, and a car accident earlier in the day involving both the victim and the victim's friend Patrick Malone. The trial court held a hearing and determined that the prior bad acts were probative and that a "material issue" existed, like a "continuation of events," making the probative value "directly linked" to Defendant's motive. In other words, the trial court ruled that the evidence was admissible.

During a four-day jury trial, the State introduced proof to show that on May 20, 2021, Patrick Malone gave the victim a ride. The two men had known each other since childhood. Mr. Malone picked the victim up in Nashville, and the victim told Mr. Malone he wanted to make a "pit stop" at a Thornton's gas station on Stewart's Ferry Pike near Nashville.

While at the gas station, the victim met with "two dudes." Mr. Malone said one of the "dudes" had short hair and the other had "dreads." They were in a black Ford truck, and the man with dreads drove. Mr. Malone did not know either of the men. The man with short hair came to their car to exchange bags with the victim. The victim got a yellow backpack from the man. According to Mr. Malone, as he and the victim drove away from the Thornton's, the men chased them in the black truck. Mr. Malone did not know why the men were chasing them but opined it had "something to do with" the victim. A shot was fired at the back of Mr. Malone's car "like once." He did not see who shot his car and did not see either of the men in the truck with a gun. Mr. Malone hit the truck with his car. He drove his car to a nearby apartment complex and parked it because it sustained heavy damage in the collision. He and the victim "[g]ot out of the car and ran" behind the apartment building. Eventually, they returned to the car to lock the doors. Officers later discovered a bullet hole in the rear driver side door. The bullet was found lodged in the back of the front passenger's seat.

A witness, Sara Thompson, saw a "really beat up" car "screech[]" into her parking spot at the apartment complex she lived in off Stewart's Ferry Pike near Donelson. Two men jumped out of the car and "took off." The driver was "run-limping," and the passenger

was running. The driver exited the car so quickly that he left the door open and the engine running.

Ms. Thompson saw the passenger return to the damaged car a few minutes later. The passenger retrieved some items from the car and left again. Ms. Thompson saw the passenger return to the car a second time about ten to fifteen minutes later with another man. The men looked at the outside of the car, got into the car, looked around inside the car, turned the car off, shut the doors to the car, and locked the doors to the car. Ms. Thompson took a video recording of the men when she saw them return to the car the second time. One of the men, later identified as the victim, was wearing the yellow backpack he was given at Thornton's. Several hours later, Ms. Thompson saw a vehicle drive past the damaged car and stop. A "taller" African American man exited the car. He had "short dreads" and wore a knit cap, khaki shorts, and a button-up shirt. He asked Ms. Thompson about the wrecked car. The man explained his "friend" was in an accident. Ms. Thompson "AirDropped" her video of the men exiting the car to the man's phone. The man told Ms. Thompson he was going to get ice cream.

The victim's girlfriend picked Mr. Malone and the victim up at the apartment complex where they left Mr. Malone's damaged car. Mr. Malone did not know the victim's girlfriend. She drove them to Rollingwood Apartments in Lebanon, where Mr. Malone lived. Mr. Malone's car bore a sticker from Rollingwood Apartments. Mr. Malone did not let the victim in his apartment but told him he "had to leave." The victim took the yellow backpack with him. Mr. Malone never saw the victim again.

Keon Maiden knew both the victim and Defendant. He and the victim knew each other from "back home in Alabama" and while they were not related, they "were raised as family." Mr. Maiden described Defendant as a "neighbor in the neighborhood." In May of 2021, Mr. Maiden received phone calls from both Defendant and the victim. Defendant described a person whom Mr. Maiden identified as the victim. Defendant did not know his name but was interested in "how to get in touch with him, how to contact him and find him." Defendant did not explain why he wanted to contact the victim. While Defendant did not explicitly state his reasons for trying to find the victim, Mr. Maiden could tell Defendant's motives were not "positive" so he "didn't disclose that [he] knew [the victim] and where [the victim] was." Mr. Maiden admitted that Defendant did not make any "threats" toward the victim but stated that if Defendant was "trying to make contact, he wanted to make it known that he's trying to make a threat." Mr. Maiden told Defendant to "leave it alone because of the consequences that could happen at the end . . . one person being dead and one person being in jail[.]" Mr. Maiden did not see either man on the date of the incident.

Lakayla Crowe had a "complicated" relationship with Defendant. She was in beauty school on the day of the incident. She left school early that day and returned to her apartment. Defendant was at her apartment, and they discussed getting ice cream. Defendant's hair was in "dreads," and he was wearing a "Hawaiian shirt" and a "maroon beanie." Defendant did not live with Ms. Crowe. He lived in a nearby apartment complex. Defendant asked Ms. Crowe to drive by his apartment complex to "make sure it was okay." Defendant mentioned to Ms. Crowe that there might be a police presence at his apartment complex. Ms. Crowe complied, driving to Defendant's apartment complex to check it out. She did not find anyone at Defendant's apartment, including police. When she returned to her own apartment, she sat on her balcony. She saw Defendant talking to someone she did not know. Later, Ms. Crowe and Defendant left to get ice cream. Defendant first asked Ms. Crowe to drive to an apartment complex near Donelson. She could not recall the name of the apartment complex. Once inside the apartment complex, Defendant exited the car and was gone for "a good [thirty] minutes." It was "getting dark" when they left the complex. They drove to Mt. Juliet to get ice cream at Culvers and sat in the store's parking lot until "it was dark outside." Defendant then asked Ms. Crowe to drive him "up to Lebanon" to another apartment complex. She did not know the name of this complex either. She recalled that they used a navigation application to get to the apartment complex. While driving around the complex, Ms. Crowe recalled passing a person walking. She could not describe this person but recalled "a flash of, like yellow or something I guess that [person] was wearing." Defendant told Ms. Crowe to park in the nearby Verizon parking lot while he "went and walked and came back." Defendant was gone for ten to fifteen minutes and did not tell her why he was getting out of the car. While sitting in the car waiting on Defendant, Ms. Crowe heard three or four gunshots. She started her car and saw someone running down the road. She started to drive around looking for Defendant and found him "[o]nce she drove all the way around, he came out on the left side," "got in the car and he had a backpack." She described Defendant as "very, very, like quiet." Defendant told Ms. Crowe he was "sorry." As they drove away, he threw what she later realized was a phone out the window of the car. Initially she "remember[ed] seeing something blue."[1]

Ms. Crowe did not see Defendant with a gun. When they got back to Nashville, Defendant did not stay with Ms. Crowe. He left and did not tell her where he was going. He left his keys to his apartment for Ms. Crowe to take care of his plants.

The victim's friend, Christopher Felton, received a call from the victim on the day of the incident. The victim asked Mr. Felton to pick him up at Rollingwood Apartments.

---

[1] In her initial statement to law enforcement, she "wasn't for sure" that it was a phone Defendant threw out the window. Ms. Crowe helped officers pinpoint the location near where Defendant threw the item out of the car. The victim's phone, complete with a blue case, was located with her help.

The victim told Mr. Felton that someone had tried to rob him earlier that day. Mr. Felton drove his truck to Rollingwood Apartments. When he arrived, he saw the victim talking to an unidentified man with dreadlocks. The man was wearing a hat. Mr. Felton did not think that the conversation appeared heated, and he did not hear any threats between the men but felt something was "weird." When the victim got into the truck, he sat his phone down and said something to the other man while the door was still open. Mr. Felton did not hear the exchange. After this exchange, the other man fired shots. Mr. Felton grabbed his Beretta APX Carry handgun, exited the truck, and ran to the nearby McDonald's. Mr. Felton heard more gunshots, for a total of four or five shots. Mr. Felton turned around to see the shooter walk around to the driver's side of the truck but did not see what else the shooter was doing. As he was running, he ran out of one of his shoes. Mr. Felton threw his gun into some bushes. He called 911 from the McDonald's drive-through. Mr. Felton could not identify the shooter. Mr. Felton was subjected to a gunshot residue ("GSR") test. The test was negative, but TBI Special Agent Lindsey Anderson explained that GSR tests can be negative even after someone shoots a gun, and that GSR tests can be positive if someone is near a gun when it is fired.

Lebanon Police Officer Chris Luna responded to the call from McDonald's on the night of the shooting. Officer Luna arrived at the entrance to the apartment complex and a sheriff's deputy told the officer that the victim was dead.

Detective Justin Sandefur processed the crime scene at Rollingwood Apartment. When he arrived, both doors of Mr. Felton's vehicle were open, and the truck was running. The victim was dead inside the truck. The victim was lying in Mr. Felton's truck with his head toward the driver's door and his feet toward the passenger door. His body was partially hanging out of the truck. Detective Steven Huddleston opined that, based on the information provided by the witness, the trajectory, the medical examiner's report, and the blood spatter, the victim was first shot in his upper arm. Then, Detective Huddleston opined, the victim slid out of the passenger seat and onto the floorboard. Detective Huddleston theorized that the victim then raised his left arm and was shot a second time. The bullet traveled through his arm and lodged in the driver's door. Detective Huddleston concluded that the shooter went to the driver's side of the truck, opened the door, and shot the victim in the crown of the head and then the forehead. Detective Huddleston concluded that the shooter's gun malfunctioned at some point because of the unfired cartridge found on the ground outside the truck.

Officers found Mr. Felton's gun in the bushes near McDonald's, "loaded to capacity." Officers located Mr. Felton's wallet in the driver's seat of the truck; it contained $280. Officers located one of Mr. Felton's shoes on the ground between his truck and the McDonald's. Detective Sandefur identified several bullet fragments and casings at the scene. Detective Sandefur collected a spent 9-millimeter cartridge case and two unfired 9-

millimeter cartridges that bore the same headstamp. Detective Sandefur also recovered 9-millimeter cartridge cases from the driver's side floorboard, the driver's seat, the passenger seat, and a fragmented bullet from inside the driver's side door of the truck. There was one latent print on the front passenger door of Mr. Felton's truck. Defendant and the victim were both excluded as contributors to the print. The TBI agent in charge of the analysis of the fingerprint, Kathi Gibson, did not have Mr. Felton's fingerprints to compare to the latent print found on the truck.

Defendant was developed as a suspect after officers got security footage from Thornton's on Stewarts Ferry Pike, Hickory Place Apartments, a nearby Mapco, and a carwash behind Thornton's. Based on the security footage from Thornton's, Detective Jeremy Drennon obtained credit card information from the driver of a black truck who purchased gasoline and a beverage. The name on the credit card matched Defendant's name, and Defendant owned the truck. Security footage confirmed that Defendant wore khaki shorts, a Hawaiian shirt, and a maroon beanie. Defendant held a yellow backpack. He placed the backpack on the middle seat of the truck, and the passenger put it in his lap. The security footage showed Mr. Malone's car driving through the parking lot. The black truck backed out of its parking place. Security footage from the Mapco showed the black truck chasing Mr. Malone's car prior to a collision that occurred when Mr. Malone's car performed a "PIT maneuver" and spun the truck around. Defendant called 911 to report the hit and run. About three weeks later, officers arrested Defendant in Georgia in a car with three other people. Officers recovered a gun from the car. Defendant cut his hair after the incident but before his arrest.

During the execution of a search warrant at Defendant's home, officers discovered live rounds that were consistent with those recovered at the scene. Officers also found an empty Springfield gun case and a box of 9-millimeter ammunition bearing the same headstamp as the cartridge cases that were found in Mr. Felton's truck. TBI Agent Denver Hall analyzed various cartridge cases and bullet fragments during the investigation. He had two guns – Mr. Felton's Beretta and a SCCY 9-millimeter pistol recovered from the car in which Defendant was riding when he was arrested. A cartridge case found inside Mr. Felton's truck and one found under the driver's seat were fired from Mr. Felton's Beretta. None of the cartridge cases were fired from the SCCY pistol. Agent Hall opined that the three remaining cartridge cases – one found on the ground next to Mr. Felton's truck, one found in the passenger seat of the truck, and one found in the truck – were fired from a third gun. Agent Hall concluded that none of the bullets examined were fired from the SCCY. The bullets found in the door of Mr. Felton's truck, the door of Mr. Malone's car, and the victim's head, chest, and shoulder had "similar class characteristics to one another" and bore "similar class characteristics" to bullets that were test-fired from Mr. Felton's Beretta, but the bullets were too damaged to permit further identification or a "more conclusive determination." Agent Hall found that the rifling characteristics of the

bullet taken from the door of Mr. Malone's car were "common to a variety of 9mm Luger caliber firearms . . . includ[ing] Springfield."

Cell phone data from Defendant's phone placed him near downtown Nashville around 5:40 or 6:00 p.m. on May 20, 2021. The phone "traveled down 24 to 40 and then to the Thorntons location." At 9:28 p.m. a "low accuracy" reading placed the phone in Lebanon and then the location of the incident in question. By 10:06 p.m., the phone appeared to be in Mt. Juliet and by 10:18 p.m. the phone was back in Davidson County.

Cell phone data from the victim's phone revealed fifteen telephone calls between the victim's phone and Defendant's phone on May 20 between 2:59 p.m. and 9:58 p.m. The calls ranged from two minutes to twenty minutes in duration. There were also several text messages between the victim and Defendant. At 5:33 pm., Defendant sent the victim a text saying he was ten minutes away. Five minutes later, the victim texted back, "Okay. He's ready." Defendant responded, "Tell him do be, bro." The victim replied, "He good, fam." Then Defendant texted the victim he was at "pump 15" in a "black truck, four door." These text messages were exchanged between the victim and Defendant when Defendant's phone was near Thorntons gas station. At 6:23 p.m., Defendant sent a voice message to the victim saying, "Bro, that's some bullsh*t, your bro ran off with my bag." Later, at 9:59 p.m., a voice message from Defendant's phone was delivered. It stated:

> Hey, bro, man, just hit me back so I can go ahead and, you know, so we can finish this up. You know I ain't, I ain't even like I never. You know the stuff went like that just, you know, she hit me back, man.

About a minute later, Defendant left a message saying, "[b]ro, let's make it right, I know you didn't mean for it to play out like that." There were also text messages and calls between Mr. Felton and the victim on the victim's phone. At 9:24 p.m. on May 20, there was a three-minute telephone call between the victim's phone and Mr. Felton's phone. A review of the text messages between Mr. Felton and the victim did not indicate that they were in any type of dispute.

The victim died from multiple gunshot wounds. The medical examiner found seven gunshot wounds caused by four or five bullets. The victim suffered gunshot wounds to the right side of his chest, his forearm, his right upper arm, and two gunshot wounds to the head. The shot to the forehead was surrounded by "stipple" meaning that the shot was fired between six and twenty-four inches from the victim's head. A second shot to the left side of the top of the victim's head went through the victim's brain and the base of his skull before exiting out of the victim's right jaw, entering his chest, and lodging near his ribs. The medical examiner concluded this shot was fired from the driver's side door of the truck

while the victim was lying down.  The medical examiner concluded the victim died as the result of a homicide.

Defendant presented the testimony of two Lebanon police officers who testified about their involvement at the crime scene.  He also presented the testimony of his private investigator who testified regarding his review of the shell casings found at the crime scene and his review of the surveillance video recordings from the Rollingwood Apartments and the Verizon store.  He stated the distance between the two locations was "right around 200 yards."

Defendant elected not to testify.

The jury found Defendant guilty as charged in the indictment.  The trial court sentenced Defendant to a sentence of life imprisonment.  Defendant filed a timely motion for new trial in which he argued that he was entitled to a new trial because 1) jurors were sleeping during trial, 2) the jury was "subjected to extended hours in the courtroom," 3) the judge "repeatedly visited and interrupted" the jury during the trial and was "inappropriately involved in the jury's deliberation process," 4) the evidence was insufficient to support the convictions, and 5) the jury was "exposed to extraneous and prejudicial information" because the doorway separating the jury and the court was open during hearings and a juror entered the courtroom during hearings.  The trial court denied the motion for new trial and Defendant appealed.  On appeal, Defendant argues: 1) the evidence was insufficient to support the convictions; 2) Defendant's right to a fair and impartial jury was violated because jurors slept during trial, the trial court required the jury to work "extensive and unreasonable hours," and the trial court interfered with the jury by holding ex parte meetings; and 3) the trial court erred in allowing the State to present evidence of uncharged bad acts.  We will examine each issue in turn.

*Analysis*
*Sufficiency of the Evidence*

First, Defendant argues that the evidence is insufficient to support the convictions.  Specifically, Defendant argues that the State failed to introduce evidence of premeditation to support the first degree murder conviction.  Defendant also argues that the State failed to prove a "taking" occurred and that, as a result, both the aggravated robbery and felony murder convictions should be reversed.  The State disagrees, arguing that there was ample evidence of premeditation and that the conflict between Defendant and the victim "was centered around the yellow backpack" possessed by the victim prior to his death and in the Defendant's possession immediately after the victim's death.

- 8 -

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(e). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id*. at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Defendant was convicted of one count of first degree premeditated murder, one count of felony murder, and one count of aggravated robbery. First degree premeditated murder is defined as "[a] premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from excitement and passion as to be capable of premeditation." *Id*. § 39-13-202(e). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Our supreme court has identified several specific circumstances that may demonstrate the existence of premeditation, including: the use of a deadly weapon on an unarmed victim; the particular cruelty of the killing; threats or declarations of intent to kill; the procurement of a weapon; any preparations to conceal the crime undertaken before the crime was committed; the destruction or secretion of evidence of the killing; calmness after the killing; evidence of motive; the use of multiple weapons in succession; the infliction of multiple wounds or repeated blows; evidence that the victim was retreating or attempting to escape when killed; the lack of provocation on the part of the victim; and the failure to render aid to the victim. *State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021) (citations

omitted). This list, however, "is not exhaustive," and "the trier of fact is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id*. at 917.

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). No culpable mental state is required for conviction of felony murder except the intent to commit the underlying felony. *Id.* § 39-13-202(b). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). A robbery is aggravated when it is "[a]ccomplished with a deadly weapon" or "[w]here the victim suffers serious bodily injury." As pertinent here, criminal attempt requires proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999).

Here, Defendant argues that there was no proof of premeditation or that he took anything from the victim. In our review, we determine the evidence submitted at trial was sufficient to sustain the convictions. Defendant followed the victim from Nashville to Lebanon after exchanging bags at the Thornton's. Before Thornton's, the victim did not have a yellow backpack. After meeting Defendant, the victim had a yellow backpack. Defendant and the victim shared telephone calls and text messages on the day of the murder both before and after the exchange at Thornton's. In one communication after the exchange, Defendant expressed displeasure with the victim about taking off with the bag. Defendant chased the victim, which ended only when Mr. Malone crashed his car into Defendant's truck. During the chase, someone in the truck shot at Mr. Malone's car. Mr. Malone parked his car at an apartment complex in Donelson where Ms. Thompson saw the strange activity and recorded it with her phone. Mr. Maiden recalled Defendant reached out to him to find out more information about the victim. Mr. Maiden could tell Defendant's reason for contacting the victim was not "positive." When Defendant was with Ms. Crowe, he told her to drive to an apartment complex near Donelson. Ms. Thompson testified that a man matching Defendant's description came to her apartment complex to discuss Mr. Malone's car. Mr. Malone's car bore a sticker from Rollingwood Apartments. She gave him a copy of the video she took of the victim, in which the victim is holding a yellow backpack. Ms. Crowe then took Defendant to get ice cream before driving him as he requested to Rollingwood Apartments where they passed a person wearing something yellow. Defendant asked Ms. Crowe to park in the Verizon parking lot and wait for him in the car. Defendant did not have a backpack when he left Ms. Crowe's

car. He left for a short while during which Ms. Crowe heard gunshots. When Defendant returned to the car, he had a yellow backpack. He was quiet and said he was "sorry." As they drove away, Defendant threw a blue cellphone out the window. This phone was later recovered and identified as the victim's phone. The victim was shot multiple times, twice from close range. Defendant left Tennessee after the murder and was arrested three weeks later in Georgia. At the time of his arrest, he had cut his "dreads." A search of Defendant's home uncovered an empty Springfield gun case and ammunition that had the same headstamp as ammunition found at the scene. The evidence was sufficient. Defendant is not entitled to relief on this issue.

*Constitutional Right to a Jury*

Next, Defendant argues that his constitutional right to a fair and impartial jury was violated by sleeping jurors, long court sessions, and ex parte communication with the jury by the trial court. Defendant acknowledges that although he raised these issues in his motion for new trial, he failed to object at trial and that now, on appeal, he can only get relief via plain error. Still, he insists he is entitled to relief. The State disagrees, arguing that Defendant has failed to establish that he is entitled to plain error relief.

As Defendant notes, appellate review is limited to issues properly preserved by the parties at trial. *See* Tenn. R. App. P. 13(b), 36(a), 3(e). By failing to object to his complaints about the perceived jury issues at trial, Defendant is not entitled to relief on appeal unless they amounted to plain error. In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this Court listed five factors to be applied to determine when alleged trial error constitutes "plain error":

> a) the record must clearly establish what occurred at trial; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

*Adkisson*, 899 S.W.2d at 641-42.

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court "formally" adopted this analysis, stating that "the *Adkisson* test provides a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection[.]" In order to be entitled to plain error relief, all five factors must be established, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 282-83. Further, "'the plain error must [have been] of such a great magnitude

that it probably changed the outcome of the trial.'" *Id*. (quoting *Adkisson*, 899 S.W.2d at 642). The defendant bears the burden of persuading the appellate court that the trial court committed plain error. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007). Through this lens we will look at each of Defendant's complaints he alleges violated his constitutional right to a fair and impartial jury.

### 1. Sleeping Jurors

Defendant argues that several jurors fell asleep during the replay of the video of Mr. Felton's interview. He insists that the record is clear as to what happened in the trial court, that he did not waive the issue for tactical reasons, that the trial court breached a clear and unequivocal rule of law, that consideration of the error is necessary to do substantial justice, and that a substantial right was affected. The State argues that Defendant cannot establish all five factors necessary for plain error relief. Specifically, the State claims Defendant cannot establish that a substantial right was affected because the only juror that was found to be asleep was dismissed at the conclusion of the trial.

This Court has held that "the fact that a juror was asleep in the jury box during a portion of the trial is not alone ground for a new trial" in the absence of an affirmative showing of prejudice. *State v. Chestnut*, 643 S.W.2d 343, 346 (Tenn. Crim. App. 1982). In fact, mere "[p]roof that a juror was asleep, standing alone, will not warrant relief." *State v. Ward*, No. W2021-00047-CCA-R3-CD, 2022 WL 2093009, at *2 (Tenn. Crim. App. June 10, 2022), *perm. app. denied* (Tenn. Sept. 9, 2022). Instead, on review, a court may consider "[t]he length of time during which the juror slept and the importance of the evidence, if any, which was taken during this period." *Chestnut*, 643 S.W.2d at 346.

Here, Defendant has failed to show that a substantial right was affected. Although the trial court commented that four jurors were "full on asleep" during the video of Mr. Felton's interview, Defendant did not object and the trial court did not make a specific finding. The trial court turned on the lights in the courtroom and encouraged the jurors to stretch or take a break. At the motion for new trial hearing, the trial court found that only one juror, Juror Number Five, was asleep and that a few other jurors had their eyes closed. The trial court explained that by agreement of the parties, Juror Number Five was removed from the jury at the conclusion of the trial. Not only does the record fail to reflect how long the juror was sleeping and/or what proof he missed, the record reflects that this juror was removed prior to deliberation. Therefore, Defendant cannot show prejudice necessary to establish that a substantial right was affected. He cannot establish all five factors necessary for plain error review and is not entitled to relief.

### 2. Excessive Hours for the Jury

- 12 -

Defendant claims the trial court "erred in requiring the jury to work extensive hours during the four[-]day trial" in violation of his right to a fair and impartial jury. Defendant insists that he is entitled to plain error relief on this issue because he can establish all five factors necessary for plain error. The State, on the other hand, argues that Defendant has failed to show that a clear and unequivocal rule of law was breached or that his substantial rights were violated by the amount of time spent in trial each day.

Defendant frames his issue as a violation of his right to a jury trial by questioning the trial court's procedure regarding the number of hours the jury worked during trial. Defendant cites *State v. Walls*, 537 S.W.3d 892 (Tenn. 2017), to support his argument that the trial court abused its discretion in "requiring the jury to work extensive hours." In *Walls*, our supreme court considered "whether the trial court erred by allowing the jury . . . to deliberate late into the night and early morning on the last day of trial." *Id.* at 894. *Walls* was a first degree murder case in which the trial lasted from Monday through Thursday, about the same amount of time as the trial herein. *Id.* The trial court in *Walls* was prepared to read the charge to the jury when the defendant had a medical emergency at around 4:00 p.m. *Id.* at 897. The trial court suspended the matter until the defendant returned from seeking medical treatment, at around 6:30 p.m. *Id.* at 898. The jury started deliberating around 7:00 p.m. and submitted a question to the trial court at around 10:40 p.m. *Id.* The jury asked for food while they were waiting on the answer to their question. At around 11:15 p.m., the trial court answered the jury's question. The jury returned a verdict at 1:05 a.m. *Id.* at 898. On direct appeal, this Court determined that the defendant properly preserved the issue for review and reversed the convictions on the basis of the late-night jury deliberations. The supreme court determined that the defendant did not properly preserve the issue for review because he failed to object or move the trial court to adjourn the trial for the day. The court went on to determine that plain error relief was unavailable because no clear and unequivocal rule of law was breached. *Id.* at 902. Our supreme court determined that the time was ripe to set forth the "correct legal standard for reviewing whether a trial court errs in conducting late-night proceedings" as abuse of discretion. *Id.* at 905. In other words, under plenary review, a trial court's decision to allow or require late-night jury deliberations is reviewed for an abuse of discretion. *Walls*, 537 S.W.3d at 904-05. Discretion is abused when a court "applies an incorrect legal standard, reaches a conclusion that is not logical, bases its decision on a clearly erroneous assessment of the evidence, or uses reasoning that causes an injustice to the complaining party." *Id.* (quoting *State v. Davidson*, 509 S.W.3d 156, 193 (Tenn. 2016)).

Here, the trial took place over the course of four days. The first day started at 9:00 a.m. with jury selection and concluded at 6:21 p.m. At some point during that first day, during the video of Mr. Felton's interview, at least one juror fell asleep. The second day began at 9:06 a.m. and ended at 5:14 p.m. The third day started at 9:44 a.m. and ended at 5:38 p.m. The fourth and final day began at 8:04 a.m. and concluded at 9:05 p.m. with the

verdict. During the trial, the trial court frequently discussed the timing of the proceedings with trial counsel, especially on the last day of trial, where the trial court allowed the jury to take multiple breaks, even telling the jury if they needed more time to deliberate, they were "welcome to deliberate into the next day." The trial court allowed the jury to take multiple breaks, including a recess for lunch each day, even encouraging jurors to stand up and stretch at different times. Defendant has not shown that the trial court breached a clear and unequivocal rule of law. *See State v. Hite*, No. W2022-00678-CCA-R3-CD, 2023 WL 4619515, at *19 (Tenn. Crim. App. July 19, 2023) (finding no error, much less plain error, in trial court's handling of jury deliberations where the trial court repeatedly offered the jurors the option of returning to the hotel for the night and deliberating the next day but the jurors unanimously agreed to continue deliberating until 10:00 p.m. and then until 10:30 p.m.), *perm. app. denied* (Tenn. Nov. 20, 2023); *State v. Avant*, No. W2018-01154-CCA-R3-CD, 2019 WL 3072131, at *9 (Tenn. Crim. App. July 12, 2019) (finding no unequivocal rule had been breached where the trial court did not require the sequestered jury to continue deliberation on Saturday night or instruct the jury to make a decision that evening because there would be no deliberation on Sunday and Monday, a state holiday). Because one of the five factors for plain error review has not been satisfied, we decline to consider the remaining factors. *Walls*, 537 S.W.3d at 901. Defendant is not entitled to relief.

### 3. Ex Parte Communication With the Jury

Defendant claims he is entitled to plain error relief because the trial court interfered with the jury during several ex parte exchanges. The State argues that Defendant cannot establish plain error because the trial court did not breach a clear and unequivocal rule of law and the record does not clearly establish what happened in the trial court.

We acknowledge that generally, it is "considered improper for the trial judge to communicate with jurors off the record and outside the presence of counsel." *State v. Tune*, 872 S.W.2d 922, 928 (Tenn. Crim. App. 1993) (citing *State v. Smith*, 751 S.W.2d 468, 472 (Tenn. Crim. App. 1988); and *State v. Mays*, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984)). Even so, our supreme court has stated:

> We recognize that there may be times when administrative communications between judge and jury may properly transpire in the absence of counsel, so long as these communications do not contain supplemental instructions relating to the case and are clearly incapable of prejudicing the rights of the parties. In this general category would be general communications relating to the jurors' welfare, comforts and physical needs. Such communications must not directly or indirectly refer to

the specifics of the case, must be collateral to the issues under consideration, and must not be capable of affecting the deliberative process in any manner.

*Guy v. Vieth*, 754 S.W.2d 601, 605 (Tenn. 1988) (quoting *Truscott v. Chaplin*, 403 F.2d 644, 645 (3d. Cir. 1968) (per curiam)).  Our supreme court has held that "reversal is required where a timely complaining party shows specific prejudice or where, owing to the nature of the ex parte communication, the reviewing court is unable to determine whether the action was actually harmless." *Id.* (emphasis in original).  Here, Defendant has not shown that a clear and unequivocal rule of law was breached.  Defendant admits in his brief that

> [s]ome of these interactions [between the trial court and the jury] appear to have related to procedural aspects of the trial – such as recesses, lunch, or "work notes" – for others, there was no explanation or reasonable justification given for the trial court's actions; and for others there were no contemporaneous explanations provided.

Defendant has failed to show that the interactions were anything but harmless. Defendant is not entitled to relief.

*Prior Bad Acts*

Lastly, Defendant argues that the trial court erred by allowing the State to introduce evidence of uncharged bad acts in violation of Tennessee Rule of Evidence 404(b). Specifically, Defendant refers to proof that Defendant was engaged in "an apparent drug deal, shoot out, car chase, and auto accident earlier in the day . . . with [the victim and Mr. Malone]."  Defendant insists that the prejudicial effect of the evidence "clearly outweighed any probative value."  The State argues that Defendant waived the issue for failing to raise it in a motion for new trial and has not asked this Court to review the issue for plain error.

"To be clear, a party seeking plain error relief must generally raise and argue the issue in the party's briefing, just as the party would do with all other issues in the ordinary course of an appeal." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *3 (Tenn. Crim. App. Oct. 30, 2023) (citing Tenn. R. App. P. 27(a)), *no perm. app. filed*. Moreover, "[w]here a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief." *State v. Thompson*, No. W2022-1535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*; *see also, e.g., Funk*, 2023 WL 7130289, "3 (applying this standard where the State argues waiver and "the Defendant failed to respond to this argument in a reply brief"); *State v. Ruzicka*, No. W2023-00134-CCA-R3-CD, 2024 WL 3387294, at *9 (Tenn. Crim. App. July 12, 2024),

*no perm. app. filed* (concluding that plain error review would normally be foreclosed where the State raises waiver and a defendant fails "file a reply brief either to rebut the waiver argument or to ask for plain error relief"); *State v. Powell*, No. W2011-02685-CCAR3-CD, 2013 WL 12185202, at \*8 (Tenn. Crim. App. Apr. 26, 2013) (declining plain error review, in part, when "Defendant did not request in his brief on appeal that this issue be reviewed for plain error, nor has Defendant filed a reply brief in which he requests plain error review" (citation omitted)), *perm. app. denied* (Tenn. Sept. 11, 2013). In the present case, the Defendant responded to the waiver argument in the reply brief, acknowledging deficiencies as well as seeking and arguing for plain error review.

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id*. at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000). When it is clear from the record that at least one of the factors cannot be established, this Court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

For evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403. Ordinarily, evidence of prior bad acts is inadmissible to show that a defendant acted in conformity with a character trait. Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its unfair prejudicial effect. Tenn. R. Evid. 404(b); *State v. Wyrick*, 62 S.W.3d 751, 771-2 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before admitting such evidence, the trial court must: (1) hold a hearing outside the jury's presence upon request; (2) determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; (3) find the proof of the other crime, wrong, or act to be clear and convincing; and (4) exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(1)-(4).

When a trial court substantially complies with the procedural requirements of Rule 404(b), this Court will not overturn the ruling absent an abuse of discretion. *See State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005). "'Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *State v. Parker*, 350 S.W.3d 883, 897 (Tenn. 2011) (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)). Here, the trial court did not breach a clear and unequivocal rule of law. The trial court heard the motion to exclude the challenged evidence outside the presence of the jury. The trial court agreed with the State that the evidence was probative because it was "directly linked" to Defendant's intent and was relevant to the question of premeditation. Moreover, the trial court concluded the exchange of the bag and following car chase were material to an issue other than Defendant's character because the incident was a continuation of events that eventually led to the victim's death. The trial court also concluded that the State introduced clear and convincing evidence and that the evidence was not unfairly prejudicial to Defendant. The trial court substantially complied with Tennessee Rule of Evidence 404(b) and did not abuse its discretion by allowing the evidence to be admitted. Thus, the trial court did not breach a clear and unequivocal rule of law. As a result, Defendant is not entitled to plain error relief.

*Judgments*

Finally, as mentioned by Defendant in his reply brief and at oral argument, there are some errors in the entry of the judgment forms in this case. It is well settled in Tennessee that, under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications. For example, merger is required when a jury returns guilty verdicts on two counts that represent alternative theories of the same offense. *See, e.g., State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998) (discussing merger of guilty verdicts on counts of both first-degree premeditated murder and first-degree felony murder); *State v. Cooper*, 336 S.W.3d 522, 523-34 (Tenn. 2011) (modifying the judgments of conviction to merge separate guilty verdicts for DUI and DUI per se). Here, Defendant was convicted of both first degree premeditated murder and felony murder for the same victim. However, this is not reflected in the judgment forms. Therefore, we must remand the case to the trial court for entry of corrected judgment forms indicating the merger. *See State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) ("The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court. Additionally, the judgment document should indicate in the 'Special Conditions' box that the conviction merges with the greater conviction. To avoid confusion, the merger also should be noted in the 'Special Conditions' box on the uniform judgment document for the greater or surviving conviction.").

- 17 -

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed and remanded for entry of corrected judgment forms as detailed above.


s/ Timothy L. Easter
TIMOTHY L. EASTER, JUDGE